UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:19-CR-00107-LEW-1 |
| | ) | |
| JAMEY BRIGLEY, | ) | |
| | ) | |
| Defendant | ) | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

On June 12, 2019, the Grand Jury charged Defendant, Jamey Brigley in an indictment alleging possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). Mr. Brigley now moves to suppress, claiming the discovery of firearms he carried in a backpack was the product of an unlawful search beyond the permitted parameters of a *Terry* stop or a search incident to arrest. Defendant's Motion to Suppress. (ECF No. 39). For the reasons that follow, the motion is denied.

### BACKGROUND

In May of 2019, a Department of Health and Human Services caseworker presented herself at the Brewer Police Department and asked if she could get an assist. She was assigned to a case involving a young couple, with child, who were not seeing eye to eye and, in her view, were engaging in conduct unbefitting parents. According to the caseworker, she had information there was drug use occurring in the home, possibly including trafficking in methamphetamine and that the man of the house, Defendant Jamey Brigley, had threatened to douse his partner in gasoline and light her on fire if she left him. As if this required further punctuation, the caseworker had information that Mr. Brigley

kept a can of gasoline by the front door so that his alleged threat not be overlooked for subtlety.  Although the officers of the Brewer Police Department were shorthanded that day, they agreed to provide the caseworker an escort to an address on South Main Street so she could investigate the well-being of the child.

Captain Anthony Pinette was dressed casually that day and was not planning to work a beat.  Nevertheless, he agreed to drive to the residence to join another officer, Joseph Everett, who intended to accompany the caseworker during her visit.  After calling up a file photograph of Defendant Jamey Brigley, Captain Pinette left the station in an unmarked Ford Explorer and approached the address traveling in a westward direction.   Before he arrived at the house, Pinette passed Brigley walking down South Main in the opposite direction carrying a backpack.  Pinette executed a U-turn and pulled up alongside Brigley.  He rolled down his window and said, "Jamey, I'd like to speak with you."  Brigley remained on the sidewalk while Pinette parked, radioed Everett, and exited the vehicle.

Pinette walked up to Brigley sporting a sidearm and belt-badge.  The first thing Pinette did was ask Brigley to take his hands out of his pockets.  Brigley complied.  Pinette then asked Brigley if he had any weapons.  Brigley said he had a knife and that he also had brass knuckles in his back pocket.  Pinette relieved Brigley of both items and told him it was a violation to carry concealed brass knuckles.

About that time Everett pulled up in a cruiser, but he remained only briefly because he was called away to another matter.[1]  During his brief presence, Everett asked Brigley if

---

[1] Everett left to respond to a call concerning a fight on Wilson Street.  On the way, Corporal Jones observed that the South Main matter was on Everett's beat, while Wilson Street was Jones's beat, so Everett agreed to turn back and take over at the house so Jones could attend to the Wilson Street matter.
*(continued next page)*

he would consent to a search of the backpack. Brigley demurred, and then Everett left. Pinette realized that he had cause to arrest Brigley for the brass knuckles violation,[2] but he was not much interested in performing an arrest without another officer on the scene. Pinette considered the fact that Brigley was purported to use methamphetamine, and Pinette did not care to engage in a struggle with someone who might be cranked up on methamphetamine, without backup. Pinette decided he would ask Brigley to walk with him down South Main Street, to the house roughly 100 yards away. Pinette explained to Brigley that there was a DHHS caseworker at the house and that some people wanted to talk to him. Pinette did not tell Brigley he was under arrest, though he did intend to take Brigley into custody and perform a search of the backpack incident to arrest.

Brigley agreed to walk with Pinette to the house. When they arrived at the driveway, Brigley must have been reconsidering his options because he asked Pinette whether he had to stay. Pinette then told Brigley that he was being detained on the concealed weapon charge. According to Pinette, that news appeared to get Brigley "amped up," and Pinette thought Brigley might make a run for it based on observing Brigley looking about, a clue to the initiated law enforcement officer that the suspect may be looking for the path of least resistance. Pinette asked Brigley to sit down. Brigley did, but the seat was wet, so Brigley stood back up. Pinette asked him again to sit down, but Brigley said he did not want to. Pinette reached for Brigley and got hold of him, but Brigley pulled away and a struggle ensued. Pinette told Brigley to get on the ground, but Brigley was not interested in

---

[2] Pinette testified that it was his intention to arrest Brigley and that, in his mind, custody started once Brigley said he had brass knuckles and Pinette could not see them on Brigley's person.

3

complying with that lawful order, either. Because Brigley was struggling, Pinette punched Brigley in the face with a closed fist. Brigley continued the fight, unabated.

Corporal Scott Jones was at that time inside the house. He heard the struggle and Captain Pinette yelling, "Get on the ground!" Jones bounded down the home's outside staircase and into the fray. After a short struggle, during which Officer Everett pulled up to the house, Everett, Jones, and Pinette secured Brigley and handcuffed him.

Because Brigley still sported his backpack, one of the officers cut it off Brigley's back. They then opened the pack and looked within. Inside the pack they found two firearms and a smaller cloth pack, or box, secured with a lock. Jones testified the size and weight of the box was consistent with a firearm, so he got it open. In fact, the box contained contraband drugs and related paraphernalia. The firearms that inform the felon in possession charge were not hidden in the box. In other words, they were apparent inside the backpack.

Before transporting Brigley to the Penobscot County Jail, Jones transported Brigley to the Brewer station. Because they had already examined the contents of the backpack, the officers kept the backpack and its contents at the station, in an evidence room or locker. They did not deliver the backpack to the jail.

## ANALYSIS

Mr. Brigley seeks to have the firearms excluded from evidence.[3] He maintains it was unlawful for Captain Pinette to conduct an investigatory stop merely for purposes of

---

[3] The illicit drugs are not material to the firearms charge, and I therefore do not address the officers' search of the locked box.

aiding a Department of Health and Human Services investigation. Motion at 4 – 5. Brigley further objects to being "forced" to walk with Pinette. *Id.* Finally, Brigley argues it was unlawful to search his backpack after his arrest because he was handcuffed and could not have gained access to anything in the backpack. *Id.*

A police officer is always free to approach a person on the street to discuss matters of concern to law enforcement, or even simply to pass the time of day. The Constitution, to the extent it applies to these interactions, permits the individual the cherished American right to be left alone, unless there is some pressing matter that permits the officer to require otherwise, such as where an officer has a reasonable basis to suspect the individual may be engaged in criminal activity. Thus:

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). In this case, to paraphrase *Terry*: "Unquestionably [Brigley] was entitled to the protection of the Fourth Amendment as he walked down the street in [Brewer]. The question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure." *Id.* (citation omitted).

After Brigley announced his possession of brass knuckles that Pinette could not see, Pinette had a reasonable basis upon which to retrieve the item and pat Brigley down. In fact, Pinette had probable cause to arrest Brigley – something I will explain in a moment.

5

After the initial retrieval of the knuckles and the knife, Brigley declined Everett's request to search his backpack and his declination was honored, for the time being. Brigley then agreed to walk to the house with Pinette. Simply stated, it is not an unreasonable invasion of one's rights when one's declination of a request to search is honored by an officer and one then consents to taking a walk with the officer. These so-called invasions of Brigley's right to go about his business, in other words, were all perfectly reasonable in origin and scope under the totality of the circumstances. The fortuity that Captain Pinette was holding in abeyance his decision to arrest for the concealed knuckles is of no moment to the analysis. Captain Pinette explained that without another officer for support, he believed he could achieve officer safety if Brigley agreed to walk with him to the residence, where he expected another officer would be waiting.

When they arrived outside the house, Brigley decided it was time to part ways with Captain Pinette. Pinette, at that point, seized Brigley. The trouble for Brigley is, the brass knuckles violation gave Pinette probable cause to arrest Brigley. In Maine, concealing knuckles is a Class D offense, and committing a Class D offense in the presence of an officer gives the officer discretion to arrest you, without a warrant. 17-A M.R.S. § 15(1)(B); 25 M.R.S. § 2004(2). Consequently, Pinette's conduct was entirely reasonable.

Finally, Brigley argues matters really got out of hand, constitutionally speaking, when the officers looked inside his backpack after he was placed in handcuffs. Brigley's argument is based on the idea that the search-incident-to-arrest doctrine is tightly cordoned by an officer's need to preserve evidence of the crime of arrest and secure the scene for officer safety. Pinette already had the knuckles that formed the basis for arrest, and Brigley

was not able to retrieve or use a weapon after he was handcuffed. So why would the officers need to search his backpack?

Brigley, it so happens, is not the first person to raise this question. Many others, including Eugene Edwards and Rudolf Abel, have found this sort of treatment objectionable. *United States v. Edwards*, 415 U.S. 800, 803 (1974); *Abel v. United States*, 362 U.S. 217, 239 (1960). The thing is, when you get arrested and taken to the local lock up for processing, it is eminently reasonable, indeed necessary, for law enforcement to determine what you have been carrying; especially if, for example, you have a couple of Smith & Wessons in your backpack. The officers might have waited to conduct their inventory of the backpack; but I find it was reasonable for them to look before arriving at the station. Reasonable officers want to know whether an arrestee's backpack contains a weapon, and their interest in excluding that possibility outweighs Brigley's interest in keeping his guns private. Fidelity to the Constitution does not compel a contrary conclusion.

## CONCLUSION

The Government has carried its burden to demonstrate the reasonableness of the warrantless search and seizure of Brigley's person and possessions. Defendant's Motion to Suppress is DENIED.

**SO ORDERED.**

**Dated this 28th day of January, 2020.**

/S/ LANCE E. WALKER
DISTRICT COURT JUDGE